IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| JAMES VASILAS, LERONE WALLIS, JR., | § | |
| JOANNE WALLIS, ALBERT AMADO, | § | |
| JONATHAN MARSHALL AND RUTH ANN | § | |
| KNOWLES, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | Civil Action No. _____ |
| VS. | § | JURY TRIAL DEMANDED |
| | § | |
| VOLKSWAGEN GROUP OF AMERICA, INC., | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiffs Lerone Wallis, Jr., Joanne Wallis, Albert Amado, Jonathan Marshall, Ruth Ann Knowles, and James Vasilas ("Plaintiffs"), file this Original Complaint and Jury Demand complaining of Defendant Volkswagen Group of America, Inc., and for cause of action state the following:

## JURY DEMAND

1.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs request a jury trial of this matter.

## PARTIES

2.     Plaintiff James Vasilas is an individual residing in Texas.  He is a citizen of Texas.  Mr. Vasilas purchased a new 2015 VW Jetta TDI from a Texas dealership located in this district.

3.     Plaintiffs Lerone Wallis and Joanne Wallis are individuals residing in Texas.  They are

citizens of Texas.  They are a married couple who purchased a new 2015 Volkswagen Jetta TDI from a Texas dealership located in this district.

4.      Plaintiff Albert Amado is an individual residing in Texas.  He is a citizen of Texas.  Mr. Amado purchased a new 2014 VW Jetta Sportwagen TDI from a Texas dealership.

5.      Plaintiff Jonathan Marshall is an individual residing in Texas.  He is a citizen of Texas. Mr. Marshall purchased a new 2013 VW Jetta TDI from a Texas dealership located in this district.

6.      Plaintiff Ruth Ann Knowles is an individual residing in Texas.  She is a citizen of Texas. Ruth Ann Knowles purchased a new 2014 VW Passat TDI from a Texas dealership located in this district.

7.      Under Federal Rule of Civil Procedure 20, Joinder of the Plaintiffs' claims in this suit is proper because their claims arise out of the same transaction, occurrence, or series of transactions or occurrences and there are questions of law and fact common to all of them will arise in the action

8.      Volkswagen Group of America, Inc. ("Volkswagen") is a corporation doing business in every U.S. state and the District of Columbia, and is organized under the laws of New Jersey, with its principal place of business at 2200 Ferdinand Porsche Dr., Herndon, Virginia 20171.  For purposes of diversity jurisdiction, Volkswagen is a citizen of both Virginia and New Jersey.

9.      Volkswagen manufactured, distributed, sold, leased, and warranted the Admittedly Fraudulent Vehicles (defined below) under the Volkswagen and Audi brand names

throughout the nation. Volkswagen and/or its agents designed the CleanDiesel engines and engine control systems in the Admittedly Fraudulent Vehicles, including the "defeat device." Volkswagen also developed and disseminated the owners' manuals and warranty booklets, advertisements, and other promotional materials relating to the Admittedly Fraudulent Vehicles.

## **VENUE AND JURISDICTION**

10.   Pursuant to 28 U.S.C. § 1332, this Court has jurisdiction over this case because it is a lawsuit between parties of diverse citizenship and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue is proper in this Court under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim occurred in this district. Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over this case because Plaintiffs have asserted a claim under the Magnuson - Moss Act seeking damages in excess of $50,000 exclusive of interest and costs (15 U.S.C. §§ 2301, et seq.). Therefore, Plaintiffs' claims arise under the laws of the United States.

11.   The Court has jurisdiction over Volkswagen because, at all relevant times, it designed, manufactured, sold, distributed, promoted and placed into the stream of commerce in Texas numerous diesel automobiles, including the diesel automobile at issue in this case. In addition, the fraudulent statements, breaches of contract, and breaches of warranty at issue in this case occurred, in part, in this district. Volkswagen also conducts business in Texas and the causes of action asserted herein arose from and are connected to purposeful acts taken by Defendants in Texas. Volkswagen's contacts with Texas were continuous and systematic.

**FACTUAL BACKGROUND**

12.   This case is about Volkswagen's elaborate scheme to defraud Plaintiffs by falsely representing that their diesel cars were "CleanDiesel" vehicles that met U.S. federal and state emissions standards, were good for the environment, fuel efficient, and fun to drive. Nothing could have been further from the truth. Unbeknownst to Plaintiffs, Volkswagen installed software on their vehicles designed to detect an emissions test and emit lower emissions during the test. But, during normal driving conditions, Volkswagen's diesel cars emitted far higher levels of pollutants. Volkswagen's representations that its diesel vehicles were good for the environment and met emissions requirements were deliberate lies. That is fraud.

13.   Plaintiffs purchased Volkswagen's "CleanDiesel" cars based on Volkswagen's fraudulent assertions that its "CleanDiesel" vehicles met U.S. federal and state emissions standards, and were good for the environment, fuel efficient, and fun to drive. Now Plaintiffs are stuck with cars that do not meet emissions standards and emit far higher levels of pollutants than Volkswagen represented—the exact opposite of the environmentally friendly, emissions compliant cars they thought they were buying. This is the textbook definition of fraudulent bait-and-switch scheme. Volkswagen baited Plaintiffs into purchasing dirty, non-compliant cars by falsely claiming that their cars were fuel efficient "CleanDiesels."

14.   The Environmental Protection Agency ("EPA"), an agency of the United States Government, regulates the emission of harmful and toxic pollutants, through laws and regulations that extend to car manufacturers. These environmental regulations are

designed to protect Plaintiffs and other U.S. citizens.

15.    Plaintiffs relied on Volkswagen's representations that its diesel cars were "CleanDiesel" vehicles that met U.S. federal and state emissions standards.  But Plaintiffs, like other U.S. consumers, did not know about Volkswagen's scheme to evade EPA and applicable state regulations by selling vehicles (manufactured by its affiliates Volkswagen AG and Audi AG) containing illegal "defeat devices." These "defeat devices" are found in Volkswagen's Volkswagen and Audi diesel vehicles for model years 2009-2015.

16.    The "defeat devices" were no software glitch.  Volkswagen intentionally installed the "defeat devices" in its diesel vehicles to defraud Plaintiffs and other U.S. consumers into buying cars that did not meet U.S. federal and state emissions standards.  Despite this outright fraud, Volkswagen had the audacity to continue to market and sell the vehicles to Plaintiffs as though they were fully compliant with the applicable EPA laws and regulations.

17.    On September 18, 2015, the EPA completed part of its investigation into Volkswagen's fraudulent "defeat devices" and issued a "Notice of Violation" ("NOV").  In the NOV, the EPA stated that Volkswagen's "defeat devices" "bypass, defeat, or render inoperable elements of the vehicles' emission control system that exist to comply with [Clean Air Act] emission standards." The EPA also found that Volkswagen's vehicles containing "defeat devices"—like the ones Volkswagen secretly installed in Plaintiffs' cars—do not satisfy the applications for the certificates of conformity that all vehicle manufacturers must obtain for each vehicle they intend to sell in the United States.

18.    Volkswagen's "defeat device" is a "switch" that senses when a vehicle's emissions are

being tested.  When the vehicle's emissions are being tested, Volkswagen designed its electronic control module to detect that testing and output results that comply with EPA emissions standards. But, when the vehicle is not being tested, however, the switch is deactivated, allowing the electronic control module to reduce the effectiveness of the system that controls emissions, effectively increasing emissions of the pollutant nitrogen oxide ("NOx") by a factor of 10 to 40.  In other words, Volkswagen installed the "defeat device" to trick Plaintiffs and other U.S. consumers into buying dirty, non-compliant cars that Volkswagen falsely marketed as "CleanDiesels."

19.     NOx pollution causes health complications and other problems.  It contributes to nitrogen dioxide, ground-level ozone, and fine particulate matter. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to force people to seek hospital treatment. Ozone and particulate matter exposure are also associated with premature death due to respiratory or cardiovascular related effects.  Children, the elderly, and people with preexisting respiratory illnesses are at an acute risk of health complications from these pollutants.

20.     Volkswagen lied to its customers, violated the Clean Air Act, and engaged in unfair competition under state and federal laws when it manufactured and sold these vehicles with "defeat devices."  Volkswagen admits that the "defeat device" was used to defraud Plaintiffs and other U.S. consumers.  So a fitting way to refer to these so-called CleanDiesels is the "Admittedly Fraudulent Vehicles."

21.     Volkswagen installed "defeat devices" in at least the following Admittedly Fraudulent Vehicles:  VW Jetta TDI (Model Years 2009 – 2015); VW Jetta SportWagen TDI (Model

Years 2009-2014); VW Golf TDI (Model Years 2010-2015); VW Golf SportWagen TDI (Model Year 2015); VW Beetle TDI and VW Beetle Convertible TDI (Model Years 2012-2015); VW Passat TDI (Model Years 2012-2015); and Audi A3 (Model Years 2009-2015). Discovery may reveal that additional vehicle models and model years are properly included as Admittedly Fraudulent Vehicles.

22.    Volkswagen marketed and advertised the Admittedly Fraudulent Vehicles as "CleanDiesels." It marketed and advertised them as clean, powerful, and EPA-certified in all 50 states. In 2009, Volkswagen began aggressively marketing the Admittedly Fraudulent Vehicles in the United States as "clean diesel" vehicles. Volkswagen engaged in this ad campaign despite the fact that it knew that marketing the Admittedly Fraudulent Vehicles as CleanDiesels was a lie.

23.    Volkswagen's most senior officials were involved in its web of lies. In 2009, VW of America's chief operating officer, Mark Barnes falsely claimed that its diesels were better for the environment than hybrid cars:

> It's also good for the environment because it puts out 25% less greenhouse gas emissions than what a gasoline engine would. And thanks to the uniqueness of the TDI motor, it cuts out the particulate emissions by 90% and the emissions of nitrous oxide are cut by 95%. So, it is a very very clean running engine. Clean enough to be certified in all 50 states.

Gayathri Vaidyanathan, "Volkswagen Preps for a Diesel Revolution," The Business Insider, Oct. 2009 (emphasis added).

24.    Despite the existence of the fraudulent "defeat devices," Barnes described Volkswagen's efforts to re-brand its diesel as "green":

The way we've gone about it is through a number of communication pieces. One of them we've used is TDI Truth & Dare. It is a very good website that compares some older diesels versus the current TDI clean diesel. And one of the things we do is we put coffee filters over the exhaust pipes of both cars. We let them run for five minutes and after they are done, we take them off and the older diesel product (not a VW diesel) has a round sooty spot on that coffee filter. Ours is very clean. In fact they actually make coffee out of the filter that was attached to the Volkswagen clean diesel tail pipe and they drink it.

As it turned out, Volkswagen's claim that its diesels were "green" was an outright lie based on intentionally falsified emissions tests.

25.    Volkswagen's fraudulent "green" marketing of its Admittedly Fraudulent Vehicles included national marketing campaigns to raise consumer awareness of what it purported to be its "TDI Clean Diesel Technology." One example of such marketing efforts was the following print advertisement:



**This ain't your daddy's diesel.**

Stinky, smoky, and sluggish. Those old diesel realities no longer apply. Enter TDI Clean Diesel. Ultra-low-sulfur fuel, direct injection technology, and extreme efficiency. We've ushered in a new era of diesel.

- **Engineered to burn low-sulfur diesel fuel**
- **"Common Rail" direct injection system**

View key fuel efficiency info

26.    In another misleading Volkswagen ad, three elderly ladies argue about whether diesel is dirty.



27.    After some debate, one of the women puts her white scarf up against the exhaust pipe and then holds it up to her face, furthering Volkswagen's lie that its diesel cars are clean.





28.     Volkswagen's false representations about the virtues of its so-called "CleanDiesel" vehicles were also made to consumers such as Plaintiffs at its dealerships.  For example, this is a picture of a "CleanDiesel" event at one of its dealerships:



29.     In addition to its lies about the Admittedly Fraudulent Vehicles environmental

friendliness, Volkswagen also touted the fuel efficiency of its so-called "CleanDiesel" cars. Volkswagen even charged a substantial <u>premium</u> for the Admittedly Fraudulent Vehicles.  For example, for the 2015 Volkswagen Jetta, the base S model has a starting MSRP of $18,780. The base TDI S "CleanDiesel," however, has a starting MSRP of $21,640, a price premium of $2,860. The "CleanDiesel" premium for the highest trim Jetta model is substantially higher: The highest level gas Jetta SE has a starting MSRP of $20,095, while the "CleanDiesel" TDI SEL MSRP is $26,410, a staggering $6,315 premium.

30.    Volkswagen charged premiums for all Admittedly Fraudulent Vehicles, and the table below sets forth the price premium for each base, mid-level and top-line trim for each Admittedly Fraudulent Vehicle model:

**CleanDiesel Price Premiums**

| Model | Base | Mid-level | Top-line |
|-------|------|-----------|----------|
| VW Jetta | $2,860 | $4,300 | $6,315 |
| VW Beetle | $4,635 | n/a | $2,640 |
| VW Golf | $2,950 | $1,000 | $1,000 |
| VW Passat | $5,755 | $4,750 | $6,855 |
| Audi A3 | $2,805 | $3,095 | $2,925 |

Volkswagen charged these premiums for the Admittedly Fraudulent Vehicles from consumers like Plaintiffs.  Of course, Plaintiffs had no idea that Volkswagen's apparent ability to make high performance, fuel efficient and environmentally friendly cars was made possible by the illegal "defeat devices" Volkswagen had secretly hidden in their cars.

31.    The EPA ordered Volkswagen to recall the Admittedly Fraudulent Vehicles and repair

them so that they comply with EPA emissions requirements at all times during normal operation. But the modifications necessary to make the Admittedly Fraudulent Vehicles EPA and Clean Air Act compliant will substantially impair the Admittedly Fraudulent Vehicles' horsepower, efficiency, and other performance characteristics. That will deprive Plaintiffs of the combination of features that prompted them to buy the Admittedly Fraudulent Vehicles in the first place. Thus, Plaintiffs will still suffer actual harm and damages even if Volkswagen somehow makes the Admittedly Fraudulent Vehicles EPA and Clean Air Act compliant. Once repaired, their vehicles will no longer perform as advertised and as they did when they were acquired, causing a diminution in value.

32.     Volkswagen's CEO has admitted Volkswagen lied to Plaintiffs, stating on September 20, 2015 that he is "personally and deeply sorry that we have broken the trust of our customers and the public." The CEO has now resigned in disgrace. Wolfgang Hatz, who was head of engines and transmissions for Volkswagen group when the diesel engine used in the Admittedly Fraudulent Vehicles was developed, has been suspended pending an internal investigation into his role in the fraudulent emissions scheme. On Monday, September 28, 2015, Volkswagen's new CEO, told the company's senior managers that its manipulation of emissions tests was "inexcusable."

33.     As a result of Volkswagen's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Admittedly Fraudulent Vehicles emit 40 times the allowed NOx levels, Plaintiffs have suffered losses in money and/or property.

34.  Had Plaintiffs been aware at the time they acquired their Admittedly Fraudulent Vehicles of the "defeat device" and its ability to allow the Admittedly Fraudulent Vehicles to emit up to 40 times the allowed levels of pollutants, Plaintiffs would not have purchased the Admittedly Fraudulent Vehicles and certainly would not have paid a premium for them.

35.  Even if Volkswagen makes the required alterations to make the Admittedly Fraudulent Vehicles EPA and Clean Air Act compliant, Plaintiffs' cars will lose fuel efficiency and performance.  So Plaintiffs have to pay more for fuel and will lose the performance characteristics of their vehicles.  Moreover, the Admittedly Fraudulent Vehicles will lose value because of their diminished performance and efficiency because of the changes needed to bring the vehicles into regulatory compliance.  Thus, Plaintiffs will lose the very combination of factors that prompted them to buy the Admittedly Fraudulent Vehicles in the first place.

36.  Plaintiffs seek compensatory and punitive damages for Volkswagen's fraud and other wrongful conduct.

**A.    Plaintiff James Vasilas.**

37.  Plaintiff James Vasilas is a citizen of Texas who purchased a new 2015 Volkswagen Jetta TDI at a Texas dealership.

38.   Mr. Vasilas became interested in buying the diesel Jetta based on the representations by Volkswagen and its agents describing the vehicle's high mileage and "clean" diesel engine, both factors that were important to him. Among other things, Mr. Vasilas relied on Volkswagen's statements on its website and in written promotional statements that the 2015 Volkswagen Jetta TDI was a clean, low-emission vehicle, a key factor in his

decision to purchase the car.

39.     When Mr. Vasilas purchased his 2015 Volkswagen Jetta TDI, he did not know that Volkswagen had installed the "defeat device," which caused his vehicle to improperly obtain an EPA certificate of conformity and to improperly pass emissions tests.  He did not know that Volkswagen's actions would allow his 2015 Volkswagen Jetta TDI to emit up to 40 times the allowed level of pollutants, including NOx.

40.     Mr. Vasilas did, however, pay a premium for his so-called "CleanDiesel" 2015 Volkswagen Jetta TDI.

41.     Volkswagen's use of the "defeat device" caused Mr. Vasilas out-of-pocket monetary loss, future attempted repairs, and a decrease in the value of his vehicle. For example, now that Volkswagen's fraud has come to light, Mr. Vasilas' Jetta TDI is now worth less than a comparable gas Jetta even though Mr. Vasilas paid a premium for the car.

42.     Volkswagen knew about and purposefully installed the "defeat device," but did not disclose the "defeat device" and it effects to Mr. Vasilas, so he purchased his vehicle on the reasonable, but mistaken, belief that the vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

43.     Volkswagen's purported "CleanDiesel" system induced Mr. Vasilas to select and purchase his 2015 Volkswagen Jetta TDI. Volkswagen, through advertisements and representations, touted the environmental friendliness of the 2015 Volkswagen Jetta TDI's engine and the performance and efficiency with which it supposedly operated.

44.     Prior to his purchase of the vehicle, Mr. Vasilas viewed advertisements regarding the CleanDiesel engine system, studied the representations on Volkswagen's website and brochure about the CleanDiesel engine, and a representative of the dealership made verbal representations about the CleanDiesel system to him. Mr. Vasilas recalls Volkswagen's advertisements and representations regarding the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Mr. Vasilas contained any disclosure relating to the "defeat device" or that Volkswagen had purposefully falsified its certification of EPA compliance. Had Volkswagen disclosed that the CleanDiesel in Mr. Vasilas's vehicle actually emitted 40 times the permitted levels of pollutants, including NOx, he would not have purchased his vehicle with the CleanDiesel engine.

45.     Mr. Vasilas has suffered an ascertainable loss as a result of Volkswagen's omissions and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of his vehicle.

46.     One of the primary reasons Mr. Vasilas purchased the 2015 Volkswagen Jetta TDI was because of his strong desire to purchase an environmentally friendly car.  As a result of Volkswagen's fraudulent "defeat device" scheme, Mr. Vasilas unwittingly purchased a vehicle that was environmentally unfriendly.  In addition, Mr. Vasilas is stuck with an environmentally unfriendly vehicle that has dropped in value, which is now a source of embarrassment and shame.  This has caused him to suffer significant emotional distress.

47.     Neither Volkswagen nor any of its agents, dealers, or other representatives informed Mr. Vasilas of the existence of the "defeat device" and/or defective design of the CleanDiesel engine prior to purchase.

**B.     Plaintiffs Lerone Wallis and Joanne Wallis.**

48.     Plaintiffs Lerone Wallis and Joanne Wallis are citizens of Texas who purchased a new 2015 Volkswagen diesel Jetta TDI at a Texas dealership.

49.      The couple became interested in buying the diesel Jetta based on the representations by Volkswagen and its agents describing the vehicle's high mileage and "clean" diesel engine, both factors that were important to them. The couple relied on Volkswagen's statements that the Jetta was a clean, low-emission vehicle, a key factor in the couple's decision to purchase the car.

50.     When the couple purchased their 2015 Jetta, the couple did not know that Volkswagen had installed the "defeat device," which caused their vehicle to improperly obtain an EPA certificate of conformity and to improperly pass emissions tests. They did not know that Volkswagen's actions would allow their 2015 Jetta to emit up to 40 times the allowed level of pollutants, including NOx.

51.     The couple did, however, pay a premium for their so-called "CleanDiesel" 2015 Jetta.

52.     Volkswagen's use of the "defeat device" caused the couple out-of-pocket monetary loss, future attempted repairs, and a decrease in the value of their vehicle. For example, now that Volkswagen's fraud has come to light, Mr. and Mrs. Wallis' 2015 Jetta TDI is now worth less than a comparable gas Jetta even though the couple paid a premium for the car.

53.     Volkswagen knew about and purposefully installed the "defeat device," but did not disclose the "defeat device" and it effects to the couple, so they purchased their vehicle on the reasonable, but mistaken, belief that the vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

54.     Volkswagen's representations about its so-called "CleanDiesel" system induced the couple to select and purchase their 2015 Jetta TDI. Volkswagen, through advertisements and other representations, touted the environmental friendliness of the 2015 Jetta's engine and the performance and efficiency with which it supposedly operated.

55.     Specifically, prior to the couple's purchase of the vehicle, they viewed advertisements regarding the CleanDiesel engine system, studied the representations on Volkswagen's brochure about the CleanDiesel engine, and a representative of the dealership made verbal representations about the CleanDiesel system to them. The couple recalls Volkswagen's television advertisements and representations regarding the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by the couple contained any disclosure relating to the "defeat device" or that Volkswagen had purposefully falsified its certification of EPA compliance. Had Volkswagen disclosed that the CleanDiesel in their vehicle actually emitted 40 times the permitted levels of pollutants, including NOx, the couple would not have purchased their vehicle with the CleanDiesel engine.

56.     The couple has suffered an ascertainable loss as a result of Volkswagen's omissions

and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of their vehicle.

57.    One of the primary reasons the couple purchased the 2015 Jetta TDI was because of their strong desire to purchase an environmentally friendly car.  As a result of Volkswagen's fraudulent "defeat device" scheme, the couple unwittingly purchased a vehicle that was environmentally unfriendly.  In addition, the couple is stuck with an environmentally unfriendly vehicle that has dropped in value, which is now a source of embarrassment and shame.  This has caused the couple to suffer significant emotional distress.

58.    Neither Volkswagen nor any of its agents, dealers, or other representatives informed the couple of the existence of the "defeat device" and/or defective design of the CleanDiesel engine prior to purchase.

59.    At all times relevant to this action, Volkswagen manufactured, sold, leased, and warranted the Admittedly Fraudulent Vehicles under the Volkswagen and Audi brand names throughout the United States.  Volkswagen and/or its agents designed, manufactured, and installed the CleanDiesel engine systems in the Admittedly Fraudulent Vehicles, which included a "defeat device."  Volkswagen also developed and disseminated the owner's manuals, warranty booklets, advertisements, website information, and other promotional material relating to the Admittedly Fraudulent Vehicles.

C.    **Plaintiff Albert Amado.**

60.    Plaintiff Albert Amado is a citizen of Texas who purchased a new 2014 Volkswagen Jetta

Sportwagen TDI at a Texas dealership.

61.  Mr. Amado became interested in buying the diesel Jetta based on the representations by Volkswagen and its agents describing the vehicle's high mileage and "clean" diesel engine, both factors that were important to him. Among other things, Mr. Amado relied on Volkswagen's statements on its website and in written promotional statements that the Jetta Sportwagen TDI was a clean, low-emission vehicle, a key factor in his decision to purchase the car.

62.  When Mr. Amado purchased his Jetta Sportwagen TDI, he did not know that Volkswagen had installed the "defeat device," which caused his vehicle to improperly obtain an EPA certificate of conformity and to improperly pass emissions tests.  He did not know that Volkswagen's actions would allow his Jetta Sportwagen TDI to emit up to 40 times the allowed level of pollutants, including NOx.

63.  Mr. Amado did, however, pay a premium for his so-called "CleanDiesel" 2014 Jetta Sportwagen TDI.  Mr. Amado paid $29,400 for the vehicle, excluding tax, title, and registration.

64.  Volkswagen's use of the "defeat device" caused Mr. Amado out-of-pocket monetary loss, future attempted repairs, and a decrease in the value of his vehicle. For example, now that Volkswagen's fraud has come to light, Mr. Amado's Sportswagen Jetta TDI is now worth less than a comparable gas Jetta even though Mr. Amado paid a premium for the car.

65.  Volkswagen knew about and purposefully installed the "defeat device," but did not disclose the "defeat device" and it effects to Mr. Amado, so he purchased his vehicle on

the reasonable, but mistaken, belief that the vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

66.     Volkswagen's purported "CleanDiesel" system induced Mr. Amado to select and purchase his 2014 Jetta Sportwagen TDI. Volkswagen, through advertisements and representations, touted the environmental friendliness of the 2014 Jetta Sportwagen TDI's engine and the performance and efficiency with which it supposedly operated.

67.     Prior to his purchase of the vehicle, Mr. Amado viewed advertisements regarding the CleanDiesel engine system, studied the representations on Volkswagen's website and brochure about the CleanDiesel engine, and a representative of the dealership made verbal representations about the CleanDiesel system to him. Mr. Amado recalls Volkswagen's advertisements and representations regarding the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Mr. Amado contained any disclosure relating to the "defeat device" or that Volkswagen had purposefully falsified its certification of EPA compliance. Had Volkswagen disclosed that the CleanDiesel in Mr. Amado's vehicle actually emitted 40 times the permitted levels of pollutants, including NOx, he would not have purchased his vehicle with the CleanDiesel engine.

68.     For example, Volkswagen made the following representations about the so-called "CleanDiesel engine in his Jetta Sportwagen TDI:

**2.0L TDI Clean Diesel engine. Engineered with the idea that less is more. The Jetta SportWagen TDI has lower $CO_2$ emissions compared to 90% of other vehicles.\* So every getaway you make will be a cleaner one.**

Of course, the brochure said nothing about the "defeat device" Volkswagen has installed on Mr. Amado's vehicle to make it falsely appear to comply with emissions requirements.

69.     The brochure went on to make representations about Volkswagen's supposed concern for the environment, touting its LEED-certified manufacturing plant in Tennessee:

# Our environment.

Building cars comes with responsibilities—
not just to you, but to the environment. And
this starts before our cars are even built, like
at our LEED⁺ Platinum-certified plant in
Chattanooga. It follows our "Think Blue.
Factory." philosophy by taking a holistic
approach to our ecological activities. Our
goal is to reduce the environmental impacts
from the Volkswagen brand's production
operations by 25% per vehicle by 2018 by
improving resource efficiency and reducing
emissions. As you can see, this sort of
thinking really does come second nature to
us. Think for yourself, please. Think Blue.



Encouraging eco-conscious behavior

The first LEED Platinum auto plant

Partnering with other progressive thinkers like MoMA,
the Surfrider Foundation, and PeopleForBikes




Volkswagen actually had the audacity to say that it was taking a leadership role in
"encouraging eco-conscious behavior" in the brochure it used to sell Mr. Amado a
vehicle containing a "defeat device" to make it falsely appear that Mr. Amado's car

complied with state and federal emissions standards.  Mr. Amado relied on these and other representations by Volkswagen when he decided to purchase his 2014 Jetta Sportwagen TDI based on his reasonable belief that the Jetta was an environmentally friendly car, emissions compliant car.

70.    Mr. Amado has suffered an ascertainable loss as a result of Volkswagen's omissions and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of his vehicle.

71.    One of the primary reasons Mr. Amado purchased the 2014 Jetta Sportwagen TDI was because of his strong desire to purchase an environmentally friendly car.  As a result of Volkswagen's fraudulent "defeat device" scheme, Mr. Amado unwittingly purchased a vehicle that was environmentally unfriendly.  In addition, Mr. Amado is stuck with an environmentally unfriendly vehicle that has dropped in value, which is now a source of embarrassment and shame.  This has caused him to suffer significant emotional distress.

72.    Neither Volkswagen nor any of its agents, dealers, or other representatives informed Mr. Amado of the existence of the "defeat device" and/or defective design of the CleanDiesel engine prior to purchase.

**D.    Plaintiff Jonathan Marshall.**

73.    Plaintiff Jonathan Marshall is a citizen of Texas who purchased a new 2013 Volkswagen Jetta TDI at a Texas dealership.

74.    Mr. Marshall became interested in buying the diesel Jetta based on the representations by Volkswagen and its agents describing the vehicle's high mileage and "clean" diesel

engine, both factors that were important to him. Before he purchased his 2013 Volkswagen Jetta TDI, Mr. Marshall intended to purchase a hybrid vehicle such as a Toyota Prius.

75.    Among other things, Mr. Marshall relied on Volkswagen's statements on its website and in written promotional statements that the 2013 Volkswagen Jetta TDI was a fuel efficient, clean, low-emission vehicle, key factors in his decision to purchase the car. For example, the brochure that Mr. Marshall reviewed prior to purchasing the vehicle contained Volkswagen's fraudulent claim that the Jetta TDI was a "CleanDiesel."

76.    When Mr. Marshall purchased his Volkswagen Jetta TDI, he did not know that Volkswagen had installed the "defeat device," which caused his vehicle to improperly obtain an EPA certificate of conformity and to improperly pass emissions tests. He did not know that Volkswagen's actions would allow Volkswagen Jetta TDI to emit up to 40 times the allowed level of pollutants, including NOx.

77.    Mr. Marshall did, however, pay a premium for his so-called "CleanDiesel" 2013 Volkswagen Jetta TDI. Mr. Marshall paid $27,640.00 for the vehicle, excluding tax, title, and registration.

78.    Volkswagen's use of the "defeat device" caused Mr. Marshall out-of-pocket monetary loss, future attempted repairs, and a decrease in the value of his vehicle. For example, now that Volkswagen's fraud has come to light, Mr. Marshall's Jetta TDI is now worth less than a comparable gas Jetta even though Mr. Marshall paid a premium for the car.

79.    Volkswagen knew about and purposefully installed the "defeat device," but did not

disclose the "defeat device" and it effects to Mr. Marshall, so he purchased his vehicle on the reasonable, but mistaken, belief that the vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

80.     Volkswagen's purported "CleanDiesel" system induced Mr. Marshall to select and purchase his 2013 Volkswagen Jetta TDI. Volkswagen, through advertisements and representations, touted the environmental friendliness of the 2013 Volkswagen Jetta TDI's engine, and the performance and efficiency with which it supposedly operated.

81.     Specifically, prior to his purchase of the vehicle, Mr. Marshall viewed television advertisements, website information, and brochures regarding the CleanDiesel engine system.  Mr. Marshall recalls Volkswagen's advertisements and representations regarding the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine system. None of the advertisements reviewed or representations received by Mr. Marshall contained any disclosure relating to the "defeat device" or that Volkswagen had purposefully falsified its certification of EPA compliance. Had Volkswagen disclosed that the CleanDiesel in Mr. Marshall's vehicle actually emitted 40 times the permitted levels of pollutants, including NOx, he would not have purchased his vehicle with the CleanDiesel engine.

82.     Mr. Marshall has suffered an ascertainable loss as a result of Volkswagen's omissions and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of his vehicle.

83.     As a result of Volkswagen's fraudulent "defeat device" scheme, Mr. Marshall unwittingly purchased a vehicle that does not meet emissions requirements and is not the "CleanDiesel" that Volkswagen represented.  In addition, Mr. Marshall is stuck with an environmentally unfriendly vehicle that has dropped in value.  This has caused him to suffer significant emotional distress.

84.     Neither Volkswagen nor any of its agents, dealers, or other representatives informed Mr. Marshall of the existence of the "defeat device" and/or defective design of the CleanDiesel engine prior to purchase.

**E.     Plaintiff Ruth Ann Knowles.**

85.     Plaintiff Ruth Ann Knowles is a citizen of Texas who purchased a new 2014 Volkswagen Jetta Sportwagen TDI at a Texas dealership.

86.     Ms. Knowles became interested in buying the diesel Jetta based on the representations by Volkswagen and its agents describing the vehicle's high mileage and "clean" diesel engine, both factors that were important to her. Among other things, Ms. Knowles relied on Volkswagen's statements on its website and in written promotional statements that the Jetta Sportwagen TDI was a clean, low-emission vehicle, a key factor in her decision to purchase the car.

87.     When Ms. Knowles purchased her Jetta Sportwagen TDI, she did not know that Volkswagen had installed the "defeat device," which caused his vehicle to improperly obtain an EPA certificate of conformity and to improperly pass emissions tests.  She did not know that Volkswagen's actions would allow his Jetta Sportwagen TDI to emit up to 40 times the allowed level of pollutants, including NOx.

88.     Ms. Knowles did, however, pay a premium for her so-called "CleanDiesel" 2014 Passat TDI.  Ms. Knowles paid $35,248 for the vehicle.

89.     Volkswagen's use of the "defeat device" caused Ms. Knowles out-of-pocket monetary loss, future attempted repairs, and a decrease in the value of her vehicle. For example, now that Volkswagen's fraud has come to light, Ms. Knowles' 2014 Passat TDI is now worth less than a comparable gas Passat even though Ms. Knowles paid a premium for the car.

90.     Volkswagen knew about and purposefully installed the "defeat device," but did not disclose the "defeat device" and it effects to Ms. Knowles, so she purchased her vehicle on the reasonable, but mistaken, belief that the vehicle complied with United States emissions standards, was properly EPA certified, and would retain all of its operating characteristics throughout its useful life.

91.     Volkswagen's purported "CleanDiesel" system induced Ms. Knowles to select and purchase her 2014 Passat TDI.  Volkswagen, through advertisements and representations, touted the environmental friendliness of the 2014 Passat TDI's engine and the performance and efficiency with which it supposedly operated.

92.     Prior to his purchase of the vehicle, Ms. Knowles viewed advertisements regarding the CleanDiesel engine system, studied the representations on Volkswagen's website and brochure about the CleanDiesel engine, and a representative of the dealership made verbal representations about the CleanDiesel system to her. Ms. Knowles recalls Volkswagen's advertisements and representations regarding the cleanliness of the engine system for the environment and the efficiency and power/performance of the engine

system.    None of the advertisements reviewed or representations received by Ms. Knowles contained any disclosure relating to the "defeat device" or that Volkswagen had purposefully falsified its certification of EPA compliance.    Had Volkswagen disclosed that the CleanDiesel in Ms. Knowles's vehicle actually emitted 40 times the permitted levels of pollutants, including NOx, she would not have purchased her vehicle with the CleanDiesel engine.

93.    Ms. Knowles has suffered an ascertainable loss as a result of Volkswagen's omissions and/or misrepresentations associated with the CleanDiesel engine system, including but not limited to, out-of-pocket loss and future attempted repairs, future additional fuel costs, and diminished value of her vehicle.

94.    One of the primary reasons Ms. Knowles purchased the 2014 Passat TDI was because of her desire to purchase an environmentally friendly car.    As a result of Volkswagen's fraudulent "defeat device" scheme, Ms. Knowles unwittingly purchased a vehicle that was environmentally unfriendly.    In addition, Ms. Knowles is stuck with an environmentally unfriendly vehicle that has dropped in value, which is now a source of embarrassment and shame.    This has caused her to suffer significant emotional distress.

95.    Neither Volkswagen nor any of its agents, dealers, or other representatives informed Ms. Knowles of the existence of the "defeat device" and/or defective design of the CleanDiesel engine prior to purchase.

## TOLLING OF THE STATUTE OF LIMITATIONS

**A.    Discovery Rule Tolling**

96.    Until the EPA announced the findings of its ongoing investigation, Plaintiffs had no way of knowing about Volkswagen's purposeful violation of the EPA's laws and regulations through the use of the "defeat device." It took federal EPA and California Air Resources Board investigations to uncover Volkswagen's deception, which involved sophisticated software manipulation by Volkswagen. The Los Angeles Times reported on September 18, 2015 about in-depth investigations by the California Air Resources Board that were needed to uncover Volkswagen's deceit.  The Board tested Volkswagen's vehicles on a special dynamometer in a laboratory, utilized open road testing with portable equipment, and used special testing devised by the Board to uncover Volkswagen's fraud. Volkswagen clearly intended to conceal the existence of its illegal "defeat devices" from Plaintiffs and from regulators.

97.    Within the time period of any applicable statutes of limitation, Plaintiffs could not have discovered through the exercise of reasonable diligence that Volkswagen was concealing the conduct complained of herein and misrepresenting the true facts concerning the emissions qualities of its Admittedly Fraudulent Vehicles.

98.    Plaintiffs did not discover, and did not know of facts that would have caused a reasonable person to suspect, that Volkswagen did not report information within its knowledge to federal and state authorities, its dealerships, or consumers.  Nor would a reasonable and diligent investigation have disclosed that Volkswagen had information in its possession about the existence of its sophisticated emissions scheme and that it opted to conceal that

information, which was discovered by Plaintiffs only shortly before this action was filed. Nor in any event would such an investigation on the part of Plaintiffs have disclosed that Volkswagen valued profits over compliance with federal and state law or the trust that Plaintiffs had placed in its representations. Volkswagen actively discouraged its personnel from raising or disclosing issues with regard to the true quality and quantity of the emissions, and the emissions software, of its vehicles, or of Volkswagen's emissions scheme.

**B.    Fraudulent Concealment Tolling.**

99.    For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to all vehicles identified herein.

100.    All applicable statutes of limitation have also been tolled by Volkswagen's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

101.    Instead of disclosing its emissions scheme, or the fact that the quality and quantity of emissions from the Admittedly Fraudulent Vehicles were far worse than represented, and of its disregard of federal and state law, Volkswagen falsely represented that its vehicles complied with federal and state emissions standards and that it was a reputable manufacturer whose representations could be trusted.

**C.    Estoppel.**

102.    Volkswagen was under a continuous duty to disclose to Plaintiffs the true character, quality, and nature of emissions from the vehicles at issue, and of those vehicles' emissions systems, and of the compliance of those systems with applicable federal and

state law.

103.    Volkswagen knowingly, affirmatively, and actively concealed the true nature, quality, and character of the emissions systems in its Admittedly Fraudulent Vehicles.

104.    Volkswagen was also under a continuous duty to disclose to Plaintiffs the true facts about the emissions of its Admittedly Fraudulent Vehicles and that it had engaged in the scheme complained of herein to evade federal and state emissions and clean air standards, and that it systematically devalued compliance with, and deliberately flouted, federal and state law regulating vehicle emissions and clean air.

105.    Based on the foregoing, Volkswagen is estopped from relying on any statutes of limitations in defense of this action.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
### (Based On Texas Law)

106.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

107.    Volkswagen's misrepresentations and omissions alleged herein, including Volkswagen's failure to disclose the CleanDiesel engine system was not EPA compliant and the existence of the "defeat device" as alleged herein, caused Plaintiffs to make their purchases of their Admittedly Fraudulent Vehicles. Absent those misrepresentations and omissions, Plaintiffs would not have purchased the Admittedly Fraudulent Vehicles, would not have purchased the Admittedly Fraudulent Vehicles at the price they paid,

and/or would have purchased alternative vehicle that did not contain non-EPA-compliant engine systems and a "defeat device." Accordingly, Plaintiffs overpaid for their Admittedly Fraudulent Vehicle and did not receive the benefit of their bargain.

108.    The sales of the Admittedly Fraudulent Vehicles to Plaintiffs constitutes a contract between Volkswagen and Plaintiffs.  Volkswagen breached these contracts by selling or leasing Plaintiffs defective Admittedly Fraudulent Vehicles and by misrepresenting or failing to disclose the CleanDiesel engine system was not EPA-compliant and failing to disclose the existence of the "defeat device," including information known to Volkswagen rendering each Admittedly Fraudulent Vehicle illegal under U.S. environmental laws, and thus less valuable, than vehicles not equipped with CleanDiesel engine systems.

109.    As a direct and proximate result of Volkswagen's breach of contract, Plaintiffs have been damaged in an amount to be proven at trial, which shall include, but is not limited to, all compensatory damages, incidental and consequential damages, and other damages allowed by law.

## COUNT II
## FRAUD BY CONCEALMENT
### (Based On Texas Law)

110.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

111.    Volkswagen intentionally concealed and suppressed material facts concerning the quality of the Admittedly Fraudulent Vehicles. As alleged in this Complaint, notwithstanding

references in the very model names of the Admittedly Fraudulent Vehicles as "Clean Diesel," or to their engines as "TDI Clean Diesel" engines, Volkswagen engaged in a secret scheme to defraud Plaintiffs and to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions of the pollutant nitrogen oxide, which contributes to the creation of ozone and smog. The software installed on the vehicles at issue was designed nefariously to kick-in during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road. The result was what Volkswagen intended: vehicles passed emissions certifications by way of deliberately fake readings. Reportedly, Volkswagen's deliberate, secret scheme resulted in noxious emissions from these vehicles at 40 times applicable standards.

112.    Plaintiffs reasonably relied upon Volkswagen's false representations. They had no way of knowing that Volkswagen's representations were false and misleading. As alleged herein, Volkswagen employed extremely sophisticated methods of deception. Plaintiffs did not and could not discover Volkswagen's deception on their own.

113.    Volkswagen's evidently values profits so much that it was willing to lie to Plaintiffs and suppress the fact that its so-called "CleanDiesel" cars did not comply with federal and state clean air law.  These emissions regulations are meant to protect the public and consumers.  Volkswagen also emphasized profits and sales above the trust that Plaintiffs placed in its representations. As one customer, John Decker said, as reported in the New York Times, "I feel totally ripped off.  It just reeks of fraud and that they intentionally misled the buyers of their vehicles into thinking these were clean diesels, environmentally good cars that were fun to drive."

114.    Volkswagen also took steps to make sure that its employees did not disclose its fraudulent scheme to regulators or consumers such as Plaintiffs. Volkswagen concealed the existence of the illegal "defeat devices" to falsely promote the Admittedly Fraudulent Vehicles as being environmentally friendly, fuel efficient, and fun to drive. Volkswagen also hid the existence of the "defeat devices" to falsely assure Plaintiffs that Volkswagen's vehicles complied with applicable law, including federal and state clean air law and emissions regulations. Volkswagen's false representations were material to Plaintiffs, both because they concerned the quality of the Admittedly Fraudulent Vehicles, including their compliance with applicable federal and state law and regulations regarding clean air and emissions, and also because the representations played a significant role in the value of the vehicles. As Volkswagen knew, its customers, including Plaintiffs, highly valued that the vehicles they were purchasing or leasing were "clean" diesel cars, and they paid a premium for that.

115.    Volkswagen had a duty to disclose its fraudulent emissions scheme concerning the Admittedly Fraudulent Vehicles because knowledge of the scheme and its underlying facts were known and/or accessible only to Volkswagen. Volkswagen had exclusive knowledge about its scheme and it also knew the facts were not known to or reasonably discoverable by Plaintiffs.

116.    Volkswagen also had a duty to disclose because it made general affirmative representations about the qualities of its Admittedly Fraudulent Vehicles with respect to emissions standards by touting them as clean diesel cars, or cars with clean diesel engines. These representations were false, misleading, deceptive, and incomplete without the disclosure of:

- The additional facts set forth above regarding its fraudulent "defeat device" scheme;

- The actual emissions of its vehicles;

- Its actual philosophy with respect to compliance with federal and state clean air law and emissions regulations; and

- Its actual practices with respect to the vehicles at issue.

117. Having volunteered to provide information to Plaintiffs, Volkswagen had the duty to disclose the entire truth. These omitted and concealed facts were material because they directly impact the value of the Admittedly Fraudulent Vehicles purchased by Plaintiffs. Whether Volkswagen's vehicles complied with federal and state clean air law and emissions regulations, and whether that manufacturer tells the truth with respect to such compliance or non-compliance, were material to Plaintiff with respect to the emissions certifications testing their vehicles must pass. Volkswagen falsely represented to Plaintiffs that they were purchasing clean diesel vehicles, and gave these representations the appearance of truth by secretly using the "defeat devices" to subvert the emission testing process.

118. Volkswagen actively concealed and/or suppressed these material facts, in whole or in part, to increase its profits and market share and to avoid the perception that its vehicles did not or could not comply with federal and state laws governing clean air and emissions. So Volkswagen secretly installed the defeat devices on the vehicles it sold to Plaintiffs so that they would not discover that the Admittedly Fraudulent Vehicles were

not "green" at all and did not comply with applicable emissions laws.

119.   On information and belief, Volkswagen has still not made full and adequate disclosures, and continues to defraud Plaintiffs and other consumers by concealing material information regarding the emissions qualities of its referenced vehicles and its emissions scheme.

120.   Plaintiffs were unaware of the omitted material facts referenced herein, and they would not have acted as they did if they had known of the concealed and/or suppressed facts, in that they would not have purchased purportedly "clean" diesel cars manufactured by Volkswagen, and/or would not have continued to drive their heavily polluting vehicles, or would have taken other affirmative steps in light of the information concealed from them. Plaintiffs' ignorance of the fact that Volkswagen had installed "defeat devices" on the vehicles was justified. Volkswagen was in exclusive control of the material facts, and such facts were not known to the public, Plaintiffs.

121.   Because of Volkswagen concealment and/or suppression of the facts, Plaintiffs have sustained significant damage.  Plaintiffs now own vehicles that are diminished in value as a result of Volkswagen's concealment of the true quality and quantity of those vehicles' emissions.  Had Plaintiffs been aware of Volkswagen's emissions schemes with regard to the vehicles at issue, and the company's callous disregard for compliance with applicable federal and state law and regulations, Plaintiffs would not have purchased the Admittedly Fraudulent Vehicles.

122.   The value of Plaintiffs' vehicles have been diminished as a result of Volkswagen's fraudulent concealment of their emissions scheme, which has greatly tarnished the

Volkswagen and Audi brand names attached to Plaintiffs' vehicles.  This has made potential purchasers of Plaintiff's vehicles reluctant to purchase any of the Admittedly Fraudulent Vehicles.  Needless to say, the fair market values of the vehicles are far less than they would have been if Volkswagen's representations about the vehicles had been true.

123.    Accordingly, Volkswagen is liable to Plaintiffs' for damages in an amount to be proven at trial.

124.    Volkswagen's acts were done wantonly, maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' rights and the representations that Volkswagen made to them, in order to enrich Volkswagen. Volkswagen's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## UNJUST ENRICHMENT
### (Based On Texas Law)

125.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

126.    As a result of its wrongful and fraudulent acts and omissions, as set forth above, pertaining to the design defect of its vehicles and the concealment of the defect, Volkswagen charged a higher price for their vehicles than the vehicles' true values and Volkswagen obtained monies which rightfully belong to Plaintiffs.

127.    Volkswagen enjoyed the benefit of increased financial gains, to the detriment of Plaintiffs and other consumers, who paid a higher price for vehicles which actually had lower

values. It would be inequitable, unjust, and unconscionable for Volkswagen to retain these wrongfully obtained profits.

128.    Plaintiffs, therefore, seek an order establishing Volkswagen as a constructive trustee of the profits unjustly obtained, plus interest.

**COUNT IV**
**BREACH OF EXPRESS WARRANTY**

129.    Plaintiffs re-allege and incorporate by reference all paragraphs as though fully set forth herein.

130.    Plaintiffs bring a cause of action against Volkswagen for breach of express warranty.

131.    Volkswagen made numerous representations, descriptions, and promises to Plaintiffs and other consumers regarding the performance and emission controls of its diesel vehicles.

132.    Volkswagen, however, knew or should have known that its representations, descriptions, and promises were false. Volkswagen was aware that it had installed "defeat devices" in the vehicles it sold to Plaintiff and other consumers.

133.    Plaintiffs and other consumers reasonably relied on Volkswagen's representations in purchasing "clean" diesel vehicles. Those vehicles, however, did not perform as was warranted. Unbeknownst to Plaintiffs and other consumers, those vehicles included devices that caused their emission reduction systems to perform at levels worse than advertised.  Those devices are defects. Accordingly, Volkswagen breached its express warranty by providing a product containing defects that were never disclosed to the

Plaintiffs.

134.    As a direct and proximate result of Volkswagen's false and misleading representations and warranties, Plaintiffs suffered significant damages and seek the relief described below.

**COUNT V**
**Breach of Implied Warranty**

135.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

136.    Plaintiffs bring this cause of action against Volkswagen for breach of implied warranty.

137.    Volkswagen made numerous representations, descriptions, and promises to Plaintiffs and other consumers regarding the functionality of Volkswagen's "clean" diesel technology.

138.    Plaintiffs and other consumers reasonably relied on Volkswagen's representations in purchasing the Admittedly Fraudulent Vehicles.

139.    As set forth throughout this Complaint, Volkswagen knew that its representations, descriptions and promises regarding its diesel engines were false.

140.    When Plaintiffs and other consumers purchased Volkswagen's diesel vehicles, they did not conform to the promises or affirmations of fact made in Volkswagen's promotional materials, including that the vehicles were designed to meet the most demanding environmental standards. Instead, as alleged above, those vehicles were designed to cheat those standards, and the vehicles emitted far higher levels of pollution than promised.

141.    Accordingly, the Admittedly Fraudulent Vehicles failed to conform to Volkswagen's

implied warranty regarding their functionality.

142.    As a direct and proximate result of Volkswagen's false and misleading representations and warranties, Plaintiffs suffered significant injury when Volkswagen sold Plaintiffs cars that, it is now clear, are worth far less than the price Plaintiffs paid for them. Accordingly, Plaintiffs seek the relief described below.

## COUNT VI
### Magnuson - Moss Act (15 U.S.C. §§ 2301, *et seq.*)—Implied Warranty

143.    Plaintiffs incorporate by reference each and every prior and subsequent allegation of this Complaint as if fully restated here.

144.    Volkswagen's Admittedly Fraudulent Vehicles are a "consumer product," as that term is defined in 15 U.S.C. § 2301(1).

145.    Plaintiffs are "consumers," as that term is defined in 15 U.S.C. §2301(3).

146.    Volkswagen is a "warrantor" and "supplier" as those terms are defined in 15 U.S.C. §2301(4) and (5).

147.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

148.    Volkswagen provided Plaintiffs and other consumers with "implied warranties," as that term is defined in 15 U.S.C. § 2301(7).

149.    Volkswagen has breached these implied warranties as described in more detail above. Without limitation, Volkswagen's Admittedly Fraudulent Vehicles are defective, as described above, which resulted in the problems and failures also described

above.

150.    By    Volkswagen's    conduct    as    described    herein,    including    Volkswagen's
knowledge of the defects inherent in the vehicles and its action, and inaction, in the face
of the knowledge, Volkswagen has failed to comply with its obligations under its written
and implied promises, warranties, and representations.

151.    In    its    capacity    as    a    warrantor,    and    by    the    conduct    described    herein,    any
attempts by Volkswagen to limit the implied warranties in a manner that would exclude
coverage of the defective software and systems is unconscionable and any such effort to
disclaim, or otherwise limit, liability for the defective the software and supporting
systems is null and void.

152.    Plaintiffs are in privity with Volkswagen in that they purchased the software from
Volkswagen or its agents.

153.    As a result of Volkswagen's breach of implied warranties, Plaintiffs are entitled to revoke
their acceptance of the vehicles, obtain damages and equitable relief, and obtain costs
pursuant to 15 U.S.C. §2310.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs, respectfully request that the Court enter judgment in Plaintiffs'
favor and against Volkswagen, as follows:

A.    Economic    damages,    non-economic    damages    (including,    without    limitation,
damages for emotional distress), and disgorgement in an amount to be determined at trial;

B.    Revocation of acceptance;

C.     Damages under the Magnuson-Moss Warranty Act;

D.     Punitive damages as permitted by applicable laws;

E.     An order requiring Volkswagen to pay both pre- and post-judgment interest

on any amounts awarded;

F.     An award of costs and attorneys' fees; and

J.     Such other or further relief as may be appropriate.

Respectfully submitted,

*/s/ **Charles W. Miller***
Charles W. Miller
State Bar No. 24007677
charles@hop-law.com
Michael Heygood
State Bar No. 00784267
michael@hop-law.com
James Craig Orr, Jr.
State Bar No. 15313550
jim@hop-law.com
Eric Pearson
State Bar No. 15690472
eric@hop-law.com
Heygood, Orr & Pearson
2331 W. Northwest Hwy., 2nd Floor
Dallas, TX 75220
(214) 237-9001
(214) 237-9001 (FAX)

**ATTORNEYS FOR PLAINTIFF**